CALLOWAY, J., Pro Tempore.
.. |, Schindler Elevator Corp. (“Schindler”) appeals a judgment denying its claim for breach of contract against Long Property Holdings, LLC, a business entity whose sole member is Michael D. Long (both generally referred to together hereafter as “Long”), and ordering it to pay Long’s attorney fees as required by a prevailing party clause in the contract between the parties. Long answers the appeal to assert error as‘to the trial court’s denial of its reconventional demand for rescission of the contract 'and other relief. Long also seeks additional attorney fees for the appeal. Finding no error and for the reasons explained infra, we affirm the trial court’s judgment and pretermit consideration of Long’s answer, 'except to award additional attorney ‘ fees for this appeal.
FACTS
In December 2008, Long purchased a two-story office building in Marshall, Texas. The building was equipped with a two-stop, Dover hydraulic elevator. Schindler was under contract with the building’s pri- or owner, D.H. Snyder (“Snyder”), to provide periodic preventive maintenance for the elevator. The- Schindler-Snyder contract was for a five-year term from June 1, 2005,- through May 31, 2010, and it contained the following clause:
5/ You will ’assign this Agreement to your successor in interest, should your interest in the premises cease prior to the initial or any ’renewal termination date. If this Agreement is terminated prematurely for any reason, other than • our default, including failure to assign to a: successor in interest as required above, you’will pay as liquidated damages (but not penalty) one/half the remaining amount due under this Agreement.
*236 UUpon the sale of the property, Snyder forwarded to Long the quarterly invoice in the amount of $561.97 for Schindler’s services from December 1, 2008, through February 28, 2009. Long paid the invoice.
On February 10, 2009, Long wrote to Larry Hammond (“Hammond”), Schindler’s branch manager, .asking him to update Schindler’s records to reflect the change in the building’s ownership. The fetter included 'Long’s contact information. It also identified David Little (“Little”) as the new property manager for the building, included' Little’s cell phone number, and stated that he would be Schindler’s “contact for onsite service visits.”
Hammond forwarded Long’s, letter to Ryan Gold, a Schindler sales representative and account manager, who then contacted Long for the purpose of having him sign a new contract. In an email on February 13, 2009, Gold forwarded a proposal for a new elevator maintenance agreement. Gold’s email refers to the proposal as being “the same in scope as what is currently in effect.” The only difference mentioned was a small decrease in price with Long paying quarterly installments of $590.19 per month, whereas Snyder paid $591.72. It appears from the email that the proposed contract was attached. Long replied that he would get back with -Gold after reviewing “this.”. He also requested a service history for the elevator, which Gold forwarded along with an explanation of Schindler’s “ScoreCard,” an online tool that provides 12 months of service history for Schindler customers’.
Long emailed Gold on February 16, 2009, because he noticed that the contract forwarded by Gold was -missing the third page; this was the pagel «that set forth the term of the contract. Gold replied that the pages must have stuck together, and he ■ sent- the complete contract. Long signed the contract on February 17, 2009. Although the Schindler-Snyder contract had been for a term of five years,, the contract signed by .Long was for a 10-year term.
■ In July 2009, Long reported a problem with the elevator door. John Dixon, a Schindler technician,- corrected the problem on- July 31, 2009, and Little signed the work report on behalf of Long. Thén, in August 2009,: Long noticed that the permit for the elevator had expired. In an email on August 25, 2009, Long asked Gold, “Is an inspection required 'to get a current permit or what is the procedure?” Gold' sent the following reply on August 26, 2009: ⅝.
In Texas every elevator is required to be tested annually and certified by a state inspector and the state issues the certificate. The inspector will contact us to let us know, when he’ll be in the area to do testing. -We’ll coordinate with him to do the testing while he’s present. Upon completion (if the elevator passes) you can purchase a certificate from the inspector.
In short, don’t worry about the certificate. Once the inspector get ’ [sic] in touch with us[,] we’ll make sure to inform you and well be able to go from there.
The elevator was finally inspected in December 2010, when Long made the arrangements after Schindler failed to do as stated in Gold’s email.
After paying Schindler’s December 2010 quarterly invoice in the amount of $638.98, Long discussed with Gold his dissatisfaction with Schindler’s services and told Gold in February 2011 that its relationship with Schindler was over. Gold did not object. Long ceased further payments. Schindler continued to send invoices to Long, and then sent him a default letter on August 11, 2011. The letter stated that Long was in ^default for nonpayment of invoices in *237 the amount of $1,346.46, and that the contract would be canceled 10 days from receipt of the letter. Referring to the liquidated damages provision, Schindler offered to. settle the matter for payment of pne-half due under the contract ,($11,517.47) in lieu of legal action. Schindler sent a second default letter on October 19,2011.
On March 14, 2013, Schindler filed suit against Long in Shreveport City Court seeking a balance of $11,563,85, plus interest, costs, and attorney fees as provided for in the contract. The suit was transferred to the First Judicial District Court on Long’s motion. In answer, Long asserted numerous affirmative defenses and a multi-count reconventional demand seeking rescission of the contract, damages, and attorney fees. Long asserted that the parties had agreed to a five-year term for the contract but that Schindler inserted a 10-year term in the final version, that Schindler failed to take care of the elevator inspection after saying it would do so, that Schindler misled it to believe there was no time left tinder Snyder’s contract, and that Schindler falsely claimed to have been providing maintenance services. In an amended answer, Long asserted that Schindler’s claim for stipulated damages was barred because the parties had terminated the contract.
In answer to Long’s reconventional demand, Schindler asserted that Long made a reasonable business decision to enter a new contract at a more favorable rate, rather than to assume the Snyder contract, and that Long was aware of the 10-year term as indicated by his initiating the page containing the term and signing the contract.
|KAt trial, the court heard testimony from Long; Ryan Bollinger (“Bollinger”), a Schindler service technician; Hammond; and William Calhoun, Bollinger’s supervisor at Schindler. In lieu of live testimony, the depositions of Gold, Little, and Stephen Jones (“Jones”), the property manager of the building prior ,to its purchase by Long, were entered.into evidence.
Regarding how Long came to enter a new contract with Schindler, Long claimed he did not know he could continue under the Schindler-Snyder contract. Gold told him that “time had run ’out” on the Schindler-Snyder contract and that Schindler “needed to do a new contract” with Long. In fact, there were 18 months, remaining on the Schindler-Snyder contract. Though Gold had a murky recollection of what he told Long about the Schindler-Snyder contract, he admitted that he called Long to have a new contract signed, that he did not offer the assignment option, and that his sales commission was based on the term and monthly rate of a new contract. As admitted by both Gold and Hammond, Gold would not have earned a commission on an assignment. Hammond explained, that, even though Schindler’s contracts include an assignment clause, Schindler wants a new contract with new owners. Hammond also testified that Gold was Long’s contact person at Schindler.
.Long testified that he and Gold spoke on the .telephone and .had email exchanges concerning the - new contract. Long claimed that he made it clear to Gold that he wanted a 5-year term tike Snyder had and that he realized after signing that the contract he entered had 10-year term. Long claimed [fithat he' discussed the mistake with Gold, who acknowledged that it was supposed to have been a five-year term and indicated that he would correct it. Gold denied recollection of any conversation with Long about the term.
Regarding the elevator permit issue, Long 'testified that he contacted Gold to find out about the procedure for getting a new permit. He admitted that he was not *238 then familiar with the Texas regulations pertaining to elevator ownership. Long testified that he understood from Gold’s email response on August 26, 2009, that Gold, would get an ■ inspector. . Long claimed that he had subsequent conversations with Gold about the inspection matter and that Gold kept saying he. would take care of it. When Gold failed to do so, Long arranged for the inspection in December 2010.
When questioned about the inspection issue, Gold admitted that he told Long not to worry about it and that Schindler would “coordinate the inspection.” He claimed that it was done “eventually,” but not “necessarily timely!” Gold also testified that it was the responsibility of a service superintendent to call the inspector. Hammond testified that Schindler’s contract provides for preventive maintenance and that it is not responsible for getting an inspector. He explained that Schindler will recommend inspectors but that the customer must call and schedule the inspection. Hammond’s testimony also indicated that Schindler will' try to perform its annual pressure test in conjunction with the inspection and “be there to perform any exercising or issues that the inspector wants us to do.” Evidence in the[1] record indicates that Schindler performed a pressure test on the day of the inspection, December TO, 2010;
[7Long testified that after the inspection, he talked with his property manager, Little, and realized that they did not' know whether Schindler had been providing any services at the building. Both Long and Little testified that the elevator equipment room is kept locked and that, except for a July 31, 2009, service call to address a problem with the elevator door, no one from Schindler had contacted-Long or Little for access to the locked equipment room. Little explained in his deposition that, though he is not on site full time, he lives three miles from the building and is on call to respond to problems there.
Copies of Schindler’s “Service Operations Work Reports” purportedly showing the preventive maintenance services provided by Schindler were admitted into evidence. The seven reports pertaining to preventive maintenance were all generated by Bollinger, and all are marked “NSA,” meaning no signature available from the customer.[1] Bollinger said that no one was there when he did the preventive maintenance and that he would not need to speak with anyone unless there was some problem. Bollinger had never met Little and stated that no one at Schindler had given him the contact information provided by Long.
When questioned about how he did preventive maintenance without access to the locked equipment room, Bollinger first claimed he could get to the internal workings of the elevator. He described what he did as riding the |selevator, listening, making sure the buttons and lights worked, checking the car top and pit, and doing “that kind of stuff.” On cross-examination, Bollinger admitted that he sometimes needed access to the locked equipment room, which contained the élevator’s motor, pump, tank, and electronic controls. He claimed that “Steve,” referring to Stephen Jones, let him in when needed. However, in his deposition, Jones testified that Long had gotten the keys to the *239 equipment room from him upon buying the building. • As of January 2009, Jones no longer provided Bollinger or anyone with Schindler access to the locked equipment room. Jones stated that Bollinger asked him to sign a service ticket in March 2009, but he refused to sign and told Bollinger that he no longer did that for the building’s owner. Jones also testified that he saw Little at the building about once every other week and that his phone number was posted on the building directory in the lobby.
Bollinger testified that he got his assignments by phone, made his service reports by phone, and checked off task lists for each visit by phone. He testified that Schindler maintains these records. Though the service reports mentioned above were produced for trial, Schindler did not produce the task lists. The tasks lists were the subject of a motion in limine filed by Long to have an adverse presumption applied against Schindler for its failure to produce them in discovery. When questioned about Schindler’s failure to produce the task lists, Hammond responded' variously that Schindler didn’t have them, that Schindler kept records for the current year, that the task lists were not part of Schindler’s record retention policy, that [9he did not know whether the task list records were' available, that the records were not kept locally, and that he did not check with Schindler’s custodian of records or IT department about whether these records were available and could be produced.
Long testified that in January 2011, he expressed to Gold his dissatisfaction with Schindler’s services. Then, ' in another conversation in February 2011, he told Gold that the relationship was not working and that he was done with Schindler. According to Long, Gold said he understood and did not object to what he was saying. When asked if he recalled a discussion with Long about parting company with Schindler, Gold responded, “Well, obviously.” Gold did not recall when the conversation occurred, but he did recall that Long’s reasons involved “building access issues” and that “he had stopped paying because we weren’t providing service.” When asked about Long’s belief that he was not getting actual inspections, by Schindler, Gold stated, “Well, I mean if-we couldn’t get into the build [sic] to provide those .services. And when we tried to make phone calls or coordinate it, we, you know, had issues with the-so, yeah, we couldn’t get in the building to do services.” Though Gold twice indicated that he recalled Long telling him that it was time to end the relationship with Schindler, Gold also testified ■ that he did not have the power to terminate the contract and that he would “always have to run it up the ladder”, to his boss.
In an oral ruling at the close of trial, the court made a number of findings. First, the trial court found that not all the service calls had been | inmadé as claimed by Schindler. This finding was based, in part, on the absence of documentation of the service calls due to Schindler’s failure to produce the task lists requested in discovery. Believing that the requested documents were likely available, the trial court presumed they would not have bene-fitted Schindler. The court was also persuaded by the lack of access to the locked elevator equipment room and the lack of explanation as to how the service calls were made without access. Second, the trial court found that .there was no meeting of the minds as .to the inspection issue. Third, the trial court found there was no meeting of the minds on the term of the contract. The ruling notes “some lack of candor” in Gold’s testimony and the fact that he did not initially include the page setting-forth the term when he forwarded the contract to Long. Fourth) addressing *240 what it considered the real question or issue, the -trial court found that the contract was terminated in February 2011 based on the oral communications between Long and Gold. For these reasons,, the trial- court denied both Schindler’s main demand and Long’s reconventional demand.
The trial court subsequently granted Long’s'motion for attorney fees based' on the prevailing party provision in the contract. After subtracting 25 hours for work on the reconventional demand, the trial court awarded attorney fees in the amount of $20,250 (135 hours at $150 per. hour), plus costs.[2]
InFollowing the final judgment, Schindler filed this suspensive, appeal, and Long answered the appeal to seek review of-the denial of its reconventional demand, in the event of a reversal of the judgment .denying Schindler’s main demand, and to seek additional attorney fees. .. .
DISCUSSION
Schindler’s appeal challenges the various factual findings made by the trial court in its oral ruling, as well- as the adverse presumption applied because of Schindler’s failure to produce the task lists requested in discovery. However, the ultimate básis of the trial court’s denial of Schindler’s demand, as well the denial'of Long’s reconventional demand for 'rescission of the contract, was the finding that the contract was terminated by oral agreement of the parties in February 2011. Therefore, we will first address the trial court’s finding of termination by oral agreement.
Schindler argues that Gold was merely a salesman, that a verbal discussion between a. salesman and an-experienced businessman, such as Long, was insufficient to modify the contract, and that .the contract required that any modification be in writ-1 ing. Long argues that Schindler did not object to the parol evidence from Long and 'Gold, that the trial court correctly found from -their testimony that the contract was terminated by oral agreement, and that Schindler does not show any manifest error in the trial court’s ruling.
The trial court’s factual findings will not be disturbed on appeal absent manifest error. Moreover-, the trial court’s reasonable evaluations of credibility and ■inferences of fact will not be disturbed on review, even 112though the appellate court may believe its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Monroe v. Physicians Behavioral Hosp., LLC, 49,248 (La.App.2d Cir.8/13/14), 147 So.3d 787. The trial court reconciles conflicting evidencé. The reviewing court does -not determine whether the trial court was right or wrong, but whether its factual conclusions are reasonable in light of the record ás a whole. Stobart v. State, through DOTD, 617 So.2d 880 (La.1993).
- A contract is an agreement between two or more parties whereby obligations are created, modified, or extinguished. La. C.C.-. art. 1906. Interpretation of a -contract is the determination of the common intent of the:parties. La.. C.C. art. 2045. Unless the law prescribes a certain formality for the contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent. La. C.C. art. 1927. Also, La. C.C. art. 1848 provides, with emphasis added: .
*241 Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act-under private signature. Nevertheless, in the interest of justice, that evidence-may be admitted to prove such circumstances as a vice of consent or to prove that the written act was modified by a subsequent and valid oral agreement.
As explained in Monroe, supra, a contract that is not required by law to be in writing may be modified by a subsequent oral agreement, and parol evidence is admissible to prove the modification. Even contracts that contain á provision specifying that it may only be' modified in writing may be subsequently modified by oral agreement. The modification may be presumed from silence, inaction, or implication. Monroe, 49,248, p. 15-16, 147 So.3d at 795-796, and cases cited therein. Thus, the court may consider parol evidence as proof of a subsequent agreement to modify or revoke a written agreement by mutual consent-of the parties. Torrey v. Simon-Torrey, Inc., 307 So.2d 569 (La.1974), citing Salley v. Louviere, 183 La. 92, 162 So. 811 (1935); Grosjean v. Grosjean, 45,529 (La.App.2d Cir.10/13/10), 50 So.3d 233, writ denied, 2010-2619 (La.2/4/11), 56 So.3d 980 and 2010-2623 (La.2/4/11), 57 So.3d 311.
Whether an oral agreement modified a written contract is a question of fact. Drive Pipeline Co. v. Cadeville Gas Storage, LLC, 49,375 (La.App.2d Cir.10/1/14), 150 So.3d 492, writ denied, 2014-2304 (La.1/23/15), 159 So.3d 1058. The party asserting modification must prove by a preponderance of the evidence the facts or acts that gave rise to the modification. Id.; Four Rivers Gaming, Inc. v. Reliable Amusement Co., 98-1581 (La.App. 3d Cir.6/16/99), 737 So.2d 938, writ denied, 99-2027 (La.10/29/99), 748 So.2d 1166.
The.-service contract entered into between Schindler and-Long-is not a contract that the law requires to be in writing. Therefore, it could be modified or revoked by oral agreement of the parties. In finding that the contract was terminated in February 2011, the trial court considered the testimonies of Long'and Gold. Long testified that he had a conversation with Gold in January 2011 about his dissatisfaction with Schindler’s services'and then told him in February 2011 that the relationship was pver. According to Long, Gold had no objection and said that he understood. Gold confirmed Long’s testimony about these conversations and recalled 114that Schindler had “building access issues” which kept it from providing services. Though- Gold testified' that he did not ‘have the authority to terminate the contract, he did not relay this'to Long and; presumably, did not run up the ladder his and Long’s discussion ■ about ending the contractual relationship. Gold testified that his' official title was sales representative but-that he also did account management. Gold represented Schindler in negotiating the contract with Long, and he was Long’s contact person at Schindler even after the contract was signed. Therefore, it was reasonable for Long to believe that Gold had the authority to terminate the contract on behalf of Schindler and that his acquiescence when Long told him that the relationship was over evidenced Schindler’s agreement to terminate.
It was within the trial court’s discretion to believe Long’s testimony over Gold’s. The record suggests that Gold misled Long in their initial negotiations so that’ he could get a commission from' a new contract and reap' a higher1 commission because of the 10-year term. He' also led Long to believe that Schindler would arrange the inspection. From our review of the record, we find no - manifest error in the trial court’s apparent credibility deter- *242 ruinations in favor of Long and finding that the contract was terminated in February 2011 by oral agreement.
Moreover, the record does not support Schindler’s claim for liquidated, damages for early termination. The contract included a provision stating, “If this Agreement is terminated prematurely for any reason, other than our default, ... you will pay as liquidated damages, (but not penalty) one/half the remaining amount due under this Agreement.” The trial court’s || ¡¡finding. that Schindler did not make all the service calls it claims is supported by a preponderance of the evidence and establishes default by Schindler that bars its claim for liquidated damages.
The service reports entered into evidence purport to show the preventive maintenance services provided by Schindler. However, none of the seven reports relating, to the provision of preventive maintenance were signed by Long or Little; rather, these reports were marked “NSA” by Bollinger. The evidence established that the elevator equipment room was locked, that Little had the key, and that no one from Schindler contacted him for access to the equipment room in order to conduct preventive maintenance. Though Bollinger testified that “Steve” provided access when needed, this testimony was refuted by Jones. Bollinger claimed he did not know to contact Little, yet Jones stated that Little was listed on the directory in the lobby of the building. Also, the record shows that Long had written to Schindler on February 10, 2009, to inform it that Little was the new property manager and new “contact for onsite ser-, vice .visits.” . The letter included Little’s contact information.
In addition to the fact that no one on behalf of Long could confirm the preventive maintenance services allegedly provided by Schindler, there was no explanation as to how Schindler provided these services for over two years without access to the locked equipment room. The contract provided that Schindler would “periodically examine, lubricate, adjust, and as needed repair or replace the Covered Components[.]” For hydraulic elevators, the covered components included:
1¶ ¡¡Basic components: Controller components: resistors, timers, fuses, overloads, minor contacts, wiring, coils; packing, drive belts, strainers, functional components of car and corridor operating stations, hangers and tracks, door operating devices, door gibs, guide shoes, rollers, traveling cables, signal lamps (replacement during regular visits only), interlocks, door closers, buffers, switches, door protection devises, and alarm bells.
Major components: Exposed piping in the Machine Room & hoistway, motor, PC boards, pump, pump unit, solid state devices, contactors, and valve.
Bollinger testified that the equipment room contained the elevator’s motor, pump, tank, and electronic controls. Review of the above description of the covered components leads us to conclude that at least some of the required preventive maintenance tasks would have required access to the equipment room. Without accessing the equipment room, Bollinger or any- other Schindler technician could not have provided the required preventive maintenance as described in the contract. Even without considering Schindler’s failure to produce the task lists relating to the preventive maintenance service calls and without applying any adverse presumption against Schindler, the record still supports the trial court’s finding that not all of the service calls were made as claimed by Schindler or as required by the contract. By failing to make the service calls as claimed and as provided in the contract, *243 Schindler defaulted. Even if we found that the trial court erred in determining that the parties terminated the contract in February 2011, we would still find that Schindler failed to prove its claim for liquidated damages. ■
Because we find no manifest error in the trial court’s finding that the parties terminated the contract in February 2011 and because we find that the record shows default by Schindler that would not entitle it to liquidated 117damages under the contract, we affirm the trial court’s judgment denying Schindler’s main demand and awarding Long attorney fees as the prevailing party on that demand. Long’s answer to the appeal concerning the denial of its reconventional demand is now moot and need not be addressed.
Finally, in answer to the appeal, Long requested additional attorney fees for this appeal. Because attorney fees were correctly awarded below in accordance with the prevailing party provision in the contract and did not include fees for work on Long’s reconventional demand, an additional award for work on this appeal is warranted. .Considering that this award should be limited to work in responding to the arguments raised by Schindler’s appeal, we award $1,000 in additional attorney fees.
CONCLUSION
For the reasons explained, we affirm the trial court’s judgment and award Long Property Holdings, LLC, additional attorney fees of $1,000 for this appeal. Costs are assessed against Schindler. Elevator Corporation.
AFFIRMED.

. The reports are dated 3/11/2009, .7/15/2009, 12/08/2009, 3/17/2010, 11/W2010, 12/15/2010, and 6/13/2011. The evidence also includes a report for the July 31/2009, service call performed by technician John Dixon; Little signed this report. Finally, there is. a report evidencing a pressure tests performed by technician Michael Lee on December 1, 2009, and by Bollinger on December 10, 2010; both are marked “NSA.”

. We note that the transcript of the trial judge's ruling on the motion for attorney fees states that the. award is to be $250 per hour, but the final judgment awarded $150 per hour. This discrepancy is not challenged by Long. ■ ■ ' ■