Judgment rendered January 10, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,403-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

WARSAW COUNTRY STORE,                    Plaintiff-Appellant
LLC

versus

BRYAN ASHLEY ENTERPRISES,                Defendant-Appellee
INC.

* * * * *

Appealed from the
Sixth Judicial District Court for the
Parish of Madison, Louisiana
Trial Court No. 2019-228

Honorable Laurie R. Brister, Judge

* * * * *

S. DOUGLAS BUSARI &                      Counsel for Appellant
ASSOCIATES, LLC
By:  S. Douglas Busari

HARVILLE LAW FIRM, LLC
By:  Douglas Lee Harville

COTTON, BOLTON, HOYCHICK                 Counsel for Appellee
& DOUGHTY, LLP
By:  David Paul Doughty

* * * * *

Before COX, THOMPSON, and MARCOTTE, JJ.

**THOMPSON, J.**

This complex property dispute arose when the owner of a one-acre parcel of land leased it and the three structures on the property to a lessee, who in turn subleased one of the structures to the sublessee for the continued operation of a bar located in that one particular building. Years later, when the parties could not agree on the monthly rental going forward, the lessee filed for eviction and the payment of past due rent. In response, the sublessee filed a reconventional demand contending the lessee had violated a noncompete agreement by allowing another bar to open operations in one of the other structures on the remainder of the property.

Following a trial on the matter, the trial court found the petition for eviction to be moot, determined that the sublessee had fully satisfied its rental obligation by placing the correct portion of rent in the court registry, and held that the lessee had violated the noncompete agreement and awarded damages pursuant to that violation. This appeal followed. For the following reasons, we affirm the trial court's judgment in part fixing the rental amount owed by the sublessee to the lessee, and we reverse the trial court's judgment finding the noncompete agreement enforceable and the awarding of damages.

## FACTS AND PROCEDURAL HISTORY

India Plantation Company, Inc. ("India Plantation") owns a one-acre tract of land in Delhi, Madison Parish, Louisiana. The tract of land (the "subject property") included three businesses, a frame building used as a country store, and two mobile structures. One mobile structure is used as a bar and the other as a restaurant. On September 20, 2002, India Plantation

leased the entire subject property to Delbert and Dicey Cockerham ("Cockerhams") for a five-year term with a five-year option to renew the lease.

On March 26, 2004, the Cockerhams sold the bar business to Bryan Ashley ("Ashley") of Bryan Ashley Enterprises, Inc. ("Ashley Enterprises") for $144,000. This Buy/Sell Agreement between the Cockerhams and Ashley was for the sale of the goodwill of the bar business and included all of the furniture, fixtures, coolers, signs, inventory, and cooking equipment owned by the Cockerhams that was used for the bar business. As the location of the bar was owned by India Plantation and was leased to Cockerhams, the Buy/Sell Agreement provided that Ashley would have the right to continue to occupy only that portion of the subject property and the structure in which the bar was operating. The Buy/Sell Agreement also included the following noncompete language:

> Seller agrees to not compete or be involved in any other similar business within a 15 mile radius of this business except the current business they are involved in, being a restaurant and remain a restaurant, not a lounge which buyer recognizes 3 video poker machines and a country store that sells package beer and groceries. Sellers guarantee and shall remain personally liable for any non-compete with buyer for any new business for a lounge or any new business that may jeopardize buyer's lounge and a video poker for the duration of buyer's lease even in the event of a sale of the restaurant.

The 2004 Buy/Sell Agreement further states that in the event the sellers violate the noncompete, they will pay all court costs associated with any legal matters.

On March 26, 2004, the Cockerhams entered into a sublease with Ashley and Ashley Enterprises, wherein they leased the bar to Ashley and Ashley Enterprises under the same terms as the Master Lease with the

2

property owner, India Plantation. Ashley Enterprises renamed the bar the "Bayou Moon Bar" and continued operations, including paying the Cockerhams the agreed-upon one-third of the total rental due to India Plantation (as the Ashleys were only leasing one of the three structures on the subject property). Therefore, as of March 26, 2004, Ashley Enterprises owned and operated the Bayou Moon Bar business and sublet the building that housed the bar from the Cockerhams. The Cockerhams continued to lease the remainder of the subject property from India Plantation and run the remaining two businesses on it.

On October 15, 2012, India Plantation and Mrs. Cockerham entered into a new Master Lease (the "2012 Master Lease") for the subject property for a period of five years beginning January 1, 2013 and ending December 31, 2017. The 2012 Master Lease included a rental table, setting forth the amount of yearly rent due for the subject property. It also stated that India Plantation's prior written consent was required before any portion of the lease could be sublet. Section 5.2 of the 2012 Master Lease stated:

(a)Regardless of LESSOR'S consent, any assignment or subletting shall not (i) be effective without the express written assumption by such assignee or sublessee of the obligations of LESSEE under this lease; (ii) release LESSEE of any obligations hereunder, or (iii) alter the primary liability of LESSEE for the payment of Rent or for the performance of any other obligations to be performed by LESSEE.

(b)Lessor may accept Rent or performance of LESSEE'S obligations from any person other than LESSEE pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of LESSOR'S right to exercise its remedies for LESSEE'S default or Breach.

(c)LESSOR'S consent to any assignment or subletting shall not constitute consent to any subsequent assignment or subletting.

3

(d)Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to LESSOR'S determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any.

The 2012 Master Lease also included an option to extend, which stated that Mrs. Cockerham had the option to extend the term of the lease for an additional five years, ending on December 31, 2022, by notifying India Plantation in writing, no later than six months prior to December 31, 2017, of her decision to exercise the option. Finally, the 2012 Master Lease states:

The terms and conditions of the original lease shall remain the same except for the rental rate which shall be brought to the current market rate. If the market rate cannot be agreed on by the Lessor and Lessee, it shall be determined by an appraiser appointed by the Lessor and an appraiser appointed by the Lessee, and a third appraiser appointed by the first two appraisers. The appraisers rental rate agreed on in writing by any of the two of the three appraisers shall be conclusive and binding on the parties to this lease.

On November 16, 2012, India Plantation gave written permission for Mrs. Cockerham to sublease Bayou Moon Bar to Ashley Enterprises "under the same terms and conditions as stated in the master lease dated October 15, 2012 between the Plantation and Dicey Cockerham." On December 6, 2012, Mrs. Cockerham and Ashley Enterprises entered into a sublease of Bayou Moon Bar, under the same terms and conditions as the 2012 Master Lease. The sublease states, "rental shall be for this certain bar area, including parking $1,208.00 per year due by Lessee semi-annually January 1st and July 1st, prorated accordingly."

The amount of rent charged by Mrs. Cockerham was one-third of what she was charged by India Plantation for the total rent of the entirety of

4

the subject property.  The sublease further states, "it is understood and agreed between Lessor and Lessee that Lessee shall have the sole right to renew the 5 year option through December 2017 provided in the original lease.  Lessor assigns all rights under that original lease to Bryan Ashley or Ashley Interprises [sic], Inc."

On October 17, 2014, Dicey Cockerham sold the country store business, the Warsaw Country Store ("Warsaw"), operated on the subject property in one of the structures not leased to Ashley Enterprises, to Jessica Allen Sinclair ("Sinclair") for $100,000.  The sale states that Sinclair will have "assumed all operating contracts and agreements of the business now currently in effect."  Mrs. Cockerham later testified, "well, when I first sold it to her I only sold her the store.  But then later I told her she could have the lease and all.  I don't know if we ever signed anything about that or what.  But I later, but all I ever sold her was the store."

In April of 2016, Sinclair subleased the restaurant on the subject property to "The Room" to operate a bar, which Ashley Enterprises believed to be in direct competition with Bayou Moon Bar.  It sent Sinclair a letter that she was in violation of its sublease for operating a bar.

On May 30, 2017, Ashley Enterprises sent a certified letter to Warsaw and Sinclair, stating that it wished to exercise its right to continue its lease for an additional five years pursuant to the 2012 Master Lease.  It copied India Plantation to the letter and enclosed $680, its one-third portion of the rent remaining for 2017.

On October 26, 2017, India Plantation executed a new Master Lease (the "2018 Master Lease") with Sinclair, with the lease term beginning on

5

January 1, 2018 and ending on December 31, 2022. Similar to the 2012 Master Lease, it included a rental table with rents due semiannually from Sinclair to India Plantation. The 2018 Master Lease includes an identical Section 5.2 and another option to extend for an additional five years until December 31, 2027. The 2018 Master Lease states that it supersedes all other versions of the Master Lease.

Ashley Enterprises continued to pay one-third of the Master Lease rentals under its sublease with Mrs. Cockerham. Although Sinclair made it clear that she wanted him to pay her more, she admits that she accepted the one-third amount for a time. Ashley offered to pay Sinclair $800 per month for an additional five years for the lease. Sinclair agreed to accept the $800 per month for a one-year lease term. The parties never agreed on the amount of rent owed by Ashley Enterprises. From 2017 through 2022, Ashley Enterprises continued to send the one-third amount it customarily paid for rent to Sinclair, who rejected the payments. Ashley deposited those payments in the court registry.

Sinclair never signed a sublease agreement directly with Ashley Enterprises or Bryan Ashley. It appears the parties entered into the appraisal process described in the Master Lease to determine the appropriate amount of rent. Sinclair's appraiser testified that a fair market value of rent for Bayou Moon Bar was $1,800 to $2,200 per month. Ashley Enterprises' appraiser testified that a fair market value would be one-third of the amount charged by India Plantation in the Master Lease.

On November 15, 2019, Warsaw filed a petition against Ashley Enterprises for past due rent and eviction, seeking $48,400 in past due rent.

Ashley Enterprises answered and filed a reconventional demand against Warsaw and Sinclair, alleging they violated the noncompete agreement, refused to accept rental payments tendered, and had interfered with the contract.

Trial on this matter was held on December 13, 2022. Ashley testified that as a part of his divorce settlement with his ex-wife, he paid her $7,500 for lost income due to the direct competition of the neighboring bar set up by Sinclair. He further testified that he believed the fair market rate for his rent was one-third of the amount charged by India to Sinclair. Testimony was also elicited from the appraisers, Mrs. Cockerham, and Sinclair on these issues.

The trial court ruled that Ashley Enterprises successfully renewed its lease for five years pursuant to its sublease with Mrs. Cockerham and found that when Ashley Enterprises renewed the lease, it retained the rights under the sublease, and India Plantation's rental to Sinclair did not change these terms. The court determined that Ashley Enterprises' rental payments were correct and that it had satisfied its lease obligations. The court found that the rule to evict was moot because the term of the lease ended on December 31, 2022. Finally, the court stated that the noncompete clause was valid and assumed by Sinclair when she bought the country store and determined that she had violated the noncompete clause by allowing The Room to operate as a bar on the subject property. The court awarded Ashley the $7,500 he paid to his ex-wife and $1,200 in attorney fees paid in their divorce settlement, in addition to all attorney fees and costs of the current litigation, totaling

$24,119.54. This appeal by Warsaw followed, in which it asserts two assignments of error.

**First Assignment of Error: This court should reverse the trial court's judgment that (1) found Warsaw Country Store and Ms. Sinclair violated a noncompete agreement with Ashley Enterprises; and (2) awarded $7,500 plus attorney's fees and costs of $24,119.54 in this matter and $1,200.00 in attorney's fees and costs in Teresa Ashley v. Bryan R. Ashley, Suit 10-114, "B" Madison Parish, Louisiana, 6th JDC, all of which damages and attorney's fees arose from Mr. Ashley's settlement of claims by his ex-wife.**

Warsaw contends that the trial court erred in finding that it violated a noncompete agreement with Ashley Enterprises and awarding damages pursuant to that alleged violation, including damages allegedly arising from Ashley's divorce proceedings. Warsaw argues that the noncompete was either invalid or expired before Sinclair ever contracted with Ashley Enterprises.

Noncompetition agreements are governed by La. R.S. 23:921, which states, in pertinent part, that every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful business, except as provided, shall be null and void. The statute then enumerates the exceptions to this general rule, including La. R.S. 23:921(B) which states:

> Any person, including a corporation and the individual shareholders of such corporation, who sells the goodwill of a business may agree with the buyer that the seller or other interested party in the transaction, will refrain from carry on or engaging in a business similar to the business being sold or from soliciting customers of the business being sold within a specified parish or parishes, or a municipality or municipalities, or parts thereof, so long as the buyer, or any person deriving title to the goodwill from him, carries on a like business therein, not to exceed a period of two years from the date of sale.

Historically, Louisiana has disfavored noncompetition agreements. *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 00-1695 (La. 6/29/01), 808 So. 2d 294;

*Board of Supervisors of Louisiana State Univ. v. McCalmont*, 54,451 (La. App. 2 Cir. 5/25/22), 339 So. 3d 1261. "Because such covenants are in derogation of the common right, they must be strictly construed against the party seeking their enforcement." *SWAT 24*, *supra*.

The record is clear that the sale of the Cockerhams' business to Ashley Enterprises included language purporting to limit the Cockerhams' ability to operate another, similar business within a 15-mile radius of the bar. The Buy/Sell agreement is dated May 24, 2004. The language is clearly a noncompete agreement as contemplated by La. R.S. 23:921(B).

Ashley argues that Sinclair assumed the noncompete restriction by purchasing business and leasehold interest from Mrs. Cockerham and that the parties agreed to a valid time restriction on the noncompete, *i.e.* the duration of the lease. However, La. R.S. 23:921(B) does not contain any language allowing for an extension of a noncompetition agreement beyond two years from the date of the sale. Allowing the parties to contract for an extension of the time period of a noncompete agreement would effectively render the express language of the statute meaningless. As such, this argument is without merit.

Ashley further argues that the noncompete agreement in the Buy/Sell agreement between the Cockerhams and Ashley Enterprises is a negative servitude that is not subject to the two-year time restriction set forth in La. R.S. 23:921(B). Louisiana law provides that predial servitudes are either affirmative or negative. Negative servitudes are those that impose on the owner of the servient estate the duty to abstain from doing something on his estate. Such are the servitudes of prohibition of building and the use of an

9

estate as a commercial or industrial establishment. La. C.C. art. 706. Predial servitudes may be established by an owner on his estate or acquired for its benefit. The use and extent of such servitudes are regulated by the title by which they are created. La. C.C. art. 697.

A predial servitude restricting or prohibiting commercial use of property is a negative, nonapparent servitude which may be acquired only by title. *RCC Props., LLC v. Wenstar Props., LP*, 40,996 (La. App. 2 Cir. 6/5/06), 930 So. 2d 1233. When a predial servitude is created by title, the intention of the parties to place a charge on one estate for the benefit of another estate, and the extent of the charge, must be expressed on the face of the title document and cannot be inferred or implied from vague or ambiguous language. *Id.* Servitudes claimed under title are never sustained by implication; the title creating them must be express as to their nature and extent, as well as to the estate that owes them and the estate to which they are due. *Id.*

As noted above, the language contained in the Buy/Sell Agreement between the Cockerhams and Ashley Enterprises, which specifically addresses the issues of not competing against the bar business, is clearly a noncompete agreement and not a negative servitude. Predial servitudes must be express and will not be implied from vague or ambiguous language. The language contained in the sale of the goodwill of the business and subsequent sublease is not explicitly a servitude. The language at issue extends for 15 miles, well beyond the one-mile tract owned by India Plantation. Moreover, neither counsel could identify an example of a sublease providing a negative servitude over land, especially absent apparent

knowledge or consent of the landowner. As such, this argument by Ashley is likewise without merit.

For the foregoing reasons, we find that the language in the Buy/Sell Agreement is a noncompete agreement between the Cockerhams and Ashley Enterprises. As mandated by La. R.S. 23:921(B), the noncompete agreement expired two years after the sale of the goodwill of the business, on May 24, 2006, long before Sinclair or Warsaw had any interest in the subject property. As such, Sinclair and Warsaw could not have violated the noncompete agreement, and the trial court's ruling to the contrary is manifestly erroneous. We must, therefore, reverse the trial court's ruling that Sinclair violated the noncompete agreement as well as the trial court's corresponding award of damages for that alleged violation.

**Second Assignment of Error: The trial court erred by finding the rent schedule set between Ms. Sinclair and India Plantation Company in the Master Lease also set the fair market rent Ms. Sinclair could charge Ashley Enterprises.**

Warsaw next argues that the trial court erred in finding that the rental schedule set between Sinclair and India Plantation in the Master Lease also set the fair market rent that could be charged to Ashley Enterprises. Warsaw contends that the only sublease Ashley Enterprises executed set a fixed rent, which was not dependent on the rent schedule set in the 2017 Master Lease.

A lease is a synallagmatic contract by which one party, the lessor, binds himself to give the other party, the lessee, the use and enjoyment of a thing for a term in exchange for a rent that the lessee binds himself to pay. The consent of the parties as to the thing and the rent is essential but not necessarily sufficient for a contract of lease. La. C.C. art. 2668. In particular, lessors are obligated to: 1) deliver that which is the subject of the

lease to the lessee; 2) maintain the object in a suitable condition; and 3) maintain the lessee in peaceable possession for the duration of the lease. *See* La. C.C. art. 2682. In contrast, the lessee is obliged to: 1) pay the rent pursuant to the terms of the lease; 2) prudently administer the lease according to the lease terms; and 3) deliver the object to the lessor at the end of the lease. *See* La. C.C. art. 2683.

Further, the particular terms of a lease form the law between the parties, defining their respective legal rights and obligations. *Pierre v. Gardner*, 53,715 (La. App. 2 Cir. 1/13/21), 311 So. 3d 574. The parties are bound by the agreement regardless of any harsh consequences contained in those agreements. *Id.* Contracts have the effect of law for the parties, and the interpretation of the contract involves the determination of the parties' common intent. La. C.C. art. 2045. We must examine the words of the contract in order to determine the reasonable intention of the parties. *Powertrain of Shreveport, L.L.C. v. Stephenson*, 49,327 (La. App. 2 Cir. 10/1/14), 149 So. 3d 1274. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. Where factual findings are pertinent to the interpretation of a contract, those factual findings are subject to the manifest error standard of review. *Davis v. Russell*, 44,909 (La. App. 2 Cir. 12/9/09), 26 So. 3d 950.

The trial court's reasonable evaluations of credibility and inferences of fact will not be disturbed on review, even though the appellate court may believe its own evaluations and inferences are as reasonable. *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989); *Monroe v. Physicians Behavioral Hosp.,*

12

*LLC*, 49,248 (La. App. 2 Cir. 8/13/14), 147 So. 3d 787. The trial court reconciles conflicting evidence. The reviewing court does not determine whether the trial court was right or wrong, but whether its factual conclusions are reasonable in light of the record as a whole. *Stobart v. State through DOTD*, 617 So. 2d 880 (La.1993); *Schindler Elevator Corp. v. Long Prop. Holdings, L.L.C.*, 50,199 (La. App. 2 Cir. 11/18/15), 182 So. 3d 233.

In the present matter, the parties admit that they did not come to an agreement regarding the amount of rent to be paid by Ashley Enterprises. At one point in their negotiation, Ashley offered to pay $800 a month for the five-year extension of the sublease. Sinclair responded that she would accept $800 per month for a one-year term. When no agreement was made, the parties sought appraisals. Dale Placke ("Placke") testified that he was hired by Sinclair to do an appraisal of Warsaw. He testified that he was unclear which building on the subject property specifically he was to appraise, but believed the bar to be around 2000 square feet. He estimated that an $1,800 to $2,000 per month rental was appropriate. Gary Robinson ("Robinson") testified that he was hired by Ashley to appraise the bar. He testified that the bar was only 1,000 square feet and that he estimated $4.10 a square foot for an annual rental rate. He testified that the master lease set the market rate for the three buildings on the property. For example, the 2018 Master Lease set the annual rental for all three buildings at $2,366.05.

The trial court heard further testimony from Ashley that he had always paid one-third of the amount of rental due under the master leases. Sinclair testified that she accepted the one-third amount of rental from

13

Ashley Enterprises for rent for a time period. Both parties testified regarding their belief in the amount of rent they believed should be due.

The trial court ultimately determined that the rentals Ashley paid into the court registry in the amount of one-third of the rent due to India Plantation fully satisfied any rental obligation owed to Warsaw and/or Sinclair. Warsaw has requested that this court remand the matter to the trial court to determine the fair market rent for the property, taking into consideration that Ashley and Sinclair at one point in their unsuccessful negotiations both raised $800 per month as a possible rent. When findings of fact are based on evaluations of witness credibility, the manifest error/clearly wrong standard demands great deference to the trial court. Only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. *Rosell*, *supra*; *Boone v. Top Dollar Pawn Shop of Bossier, LLP*, 50,493 (La. App. 2/24/16), 188 So. 3d 1093.

We find no manifest error in the trial court's determination that Ashley Enterprises' rental obligation was satisfied by the payment of one-third of the amount due under the master leases. The trial court heard all testimony presented, including the testimony regarding the proposed $800 per month rental. We cannot say it was an abuse of discretion for the court to find that the one-third amount that Ashley Enterprises traditionally paid for rent was the fair market value and that Ashley Enterprises had satisfied

14

its obligation by placing that amount in the court registry. Consequently, this assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, the trial court's ruling that Bryan Ashley Enterprises, Inc. satisfied its rental obligations owned to Warsaw Country Store, LLC and/or Jessica Sinclair from January 1, 2018 through December 31, 2022 is affirmed. Further, the trial court's ruling that Warsaw Country Store, LLC and Jessica Allen Sinclair violated the noncompete agreement is reversed, and therefore, the trial court's awards of $7,500 and attorney fees and costs in the amount of $24,119.54 for the current litigation and attorney fees in the amount of $1,200 in the divorce case to Bryan Ashley Enterprises, Inc. cast against Warsaw Country Store, LLC and Jessica Allen Sinclair are hereby reversed. Costs of this appeal are assessed equally between Bryan Ashley Enterprises, Inc. and Warsaw Country Store, LLC.

**AFFIRMED IN PART; REVERSED IN PART.**